**DOMENECH, Treasurer, v. LEE.**
No. 2779.

Circuit Court of Appeals, First Circuit.
June 5, 1933.

William Cattron Rigby, of Washington, D. C. (Fred W. Llewellyn and Kyle Rucker, both of Washington, D. C., and Charles E. Winter, Atty. Gen., San Juan, Puerto Rico, on the brief), for appellant.

J. Edmund Kelly, of Buffalo, N. Y. (Rann, Vaughan, Brown & Sturtevant and Noel S. Symons, all of Buffalo, N. Y., on the brief), for appellee George L. Squier Mfg. Co.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

BINGHAM, Circuit Judge.

This is an appeal from a decree of the federal District Court for Puerto Rico sitting in bankruptcy. It was found in the court below that the George L. Squier Manufacturing Company, intervener, a New York corporation with its principal place of business in the city of Buffalo, N. Y., sold to the Central San Miguel, the bankrupt, a sugar factory located on a parcel of land in Puerto Rico having an area of 20 cuerdas, and, to secure the purchase price, the Central San Miguel gave to the manufacturing company a mortgage covering the property, which mortgage was duly recorded November 13, 1926; that of the sum secured by the mortgage there remained due $222,000, principal, and interest at 6 per cent. on $111,000 of the principal from July 1, 1929, and interest at 8 per cent. per year on the remaining $111,000 from July 1, 1929; and, in addition thereto, the

sum of $6,000 stipulated in the mortgage to cover costs, disbursements, and counsel fees in the foreclosure of the mortgage; that the principal sum, by the terms of the mortgage and the laws of Puerto Rico, was further increased by the payment of taxes assessed against the bankrupt upon the real estate for the fiscal years 1928–29, 1929–30, and 1930–31, amounting to the sum of $27,901.51, which the manufacturing company paid on May 14, 1931, the bankrupt having failed to do so.

It further appeared that on June 23, 1931, a petition in bankruptcy was filed in the federal District Court for Puerto Rico against the Central San Miguel, and that, on that date, the District Court, at the instance of the petitioning creditors, issued an order staying, among other suits, a foreclosure proceeding brought by the manufacturing company to foreclose the mortgage, and staying attachments or notices of sales announced for the 25th of June, 1931, by Manuel V. Domenech, treasurer of Puerto Rico, for the sale of the real estate for taxes assessed against the bankrupt and claimed to be due, amounting to $26,081.83, and also ordering the custodian of the property in the insular District Court of Humacao forthwith to deliver the same to the receiver in bankruptcy, including property of every kind whatsoever of which he had possession as such custodian; that on July 3, 1931, Domenech, the treasurer of Puerto Rico, filed a petition (called a motion) in the District Court to set aside its order of June 23, 1931, staying the sale of real estate to satisfy the taxes, and the receiver and the George L. Squier Manufacturing Company filed an answer (called an opposition) to the petition. In the petition it was alleged that the Central San Miguel, the bankrupt, owed the people of Puerto Rico for taxes assessed upon its personal property for the years 1928–29 and 1929–30 the sum of $1,955.22; for taxes by way of workmen's relief premiums for the years 1928–29 to and including 1930–31, the sum of $4,501.86; for corporation income taxes for the year 1927 the sum of $4,326.25; for taxes for interest which the bankrupt owed and paid the George L. Squier Manufacturing Company and to the Puerto Rico International Corporation for 1927, 1928, and 1929, and which it should have withheld at its source, the sum of $8,779.84; and for excise taxes for the years 1928–29 and 1929–30, the sum of $6,518.66—making a total of $26,081.83; that these taxes were a prior lien on all the property of the taxpayer; that the treasurer of

Puerto Rico, in pursuance of law, had at two different times in 1930 and 1931 given notice of an attachment of the land for the purpose of selling the same and advertising said taxes, and in May, 1931, had authorized the giving of a notice of attachment of 200 bags of sugar in the possession of Central San Miguel and the seizure thereunder of 199 bags of sugar by the collector on June 5 and 6, 1931; that the court, as above stated, had, on June 23, 1931, enjoined the sale of the real estate by the treasurer as well as other suits in the insular District Court; that the notices of attachments fulfilled all the requirements of law; that the District Court was without jurisdiction to restrain the treasurer from making a sale of the property; and prayed the court to set aside its order of June 23, 1931.

In the answer the George L. Squier Manufacturing Company denied all the material allegations contained in the petition of the treasurer of Puerto Rico, and, among other things, denied the amount of the taxes, that they were due, and that they were prior liens to the mortgage lien which it held, on all the property or any of the property of the bankrupt. It alleged that it appeared from the motion that, during the years 1928–29 and 1929–30, the bankrupt had personal property in excess of $4,000, and that, according to the provisions of sections 336 and 339 of the Political Code of Puerto Rico, the alleged attachments were void and created no lien or right superior to the lien of the intervener; that the people of Puerto Rico had no lien whatsoever for taxes that accrued for the personal property and excise taxes; that the people of Puerto Rico likewise had no lien or right whatever prior and superior to the lien of the intervener on the land in question for income taxes or for workmen's relief premiums; that the intervener, by virtue of its mortgage of August, 1926, held a lien on the real property in question prior and superior to any lien of the people of Puerto Rico; that it had paid the people of Puerto Rico the taxes assessed on the real estate, amounting to $27,901.51; and that, on June 12, 1931, it had instituted foreclosure proceedings on the mortgage against the bankrupt in the District Court of Humacao; and prayed for an order denying the petition of the treasurer of Puerto Rico.

While the controversy raised by the motion and opposition was pending, the intervener, the Squier Manufacturing Company, obtained leave of the District Court to foreclose its mortgage in the insular court by fil-

ing a bond in the sum of $30,000 "to secure the payment of all taxes alleged to be due by the bankrupt in the motion * * * as would be found to be actually due and to have constituted a lien on the bankrupt's real property prior and paramount to the mortgage of said George L. Squier Manufacturing Company." This was done pursuant to an agreement of the parties; the bond being in effect substituted for the real estate about which the controversy arose.

A hearing in the above matter having been had before the District Court on May 16, 1932, upon a stipulation of facts dated September 29, 1931, and other evidence, the District Court on May 26, 1932, found that on the date of the filing of the petition, July 3, 1931, "the following taxes were due and owing by the bankrupt to The People of Porto Rico: (a) For taxes assessed and levied on the personal property of the bankrupt for the fiscal years 1928–29 and 1929–30, including surcharges, the sum of $1,955.22; (b) For premiums assessed and levied for the Workmen's Relief Commission for the fiscal years 1928–29 to 1930–31, inclusive, including surcharges, the sum of $4,501.86; (c) For income taxes assessed and levied on the income of the bankrupt for the year 1927, including surcharges, the amount of $4,326.25; (d) For excise taxes assessed and levied on the bankrupt for the manufacture of sugar for the years 1928–29 and 1929–30, including surcharges, the sum of $6,518.66"—a total amount of $17,301.99, that being the difference in the amount of taxes claimed by the treasurer of $26,081.83 and the sum of $8,779.84 claimed to be due and to be withheld by the bankrupt at the source. In other words, the District Court disallowed that sum. It also found that the bankrupt commenced the manufacture and had actually produced sugar since the year 1927 each year during the months of January to June up to and including the year 1931; that, after deducting 65 per cent. of the sugar manufactured, which belonged to the colonos, the bankrupt had and actually owned during the years in question the following amounts: For 1927–28, 45,909.50 quintals; for 1928–29, 37,849 quintals; for 1929–30, 34,349.70 quintals; and for 1930–31, 22,953.70 quintals; and it otherwise appeared that the price of sugar for each of the last two years was $3 per quintal or per a hundred pounds, showing that for the year 1930 the bankrupt had personal attachable property in sugar of the value of $192,900 and for 1931 of the value of $68,700, this being the year in which the attachments of the real property or no-

tices of sale thereof were made; that the bankrupt's schedule of personal property dated October 27, 1931, showed personal property consisting of office furniture, chains for cane, materials for laboratory, goods and repairing tools, and a tractor Ford, of a value in excess of $12,000; that for the year 1931 the bankrupt had molasses which it had produced amounting to about $2,000, and always had warehouse supplies on hand of from $5,000 to $6,000; and that on December 8, 1931, the real estate in question was sold in the foreclosure proceeding to the intervener for the sum of $100,000, which sum was credited to the principal and interest due it and the amount of the real estate taxes which it had paid.

The District Court, having made its findings of fact, ruled: (1) That the so-called attachments made by the treasurer in July, 1930, and April, 1931, to collect the taxes in question were void and did not constitute a lien upon the real estate or any part of it; (2) that the taxes claimed to be due by the treasurer of Puerto Rico "never did and do not constitute a statutory lien on the real property attached, prior and paramount to the mortgage lien"; and (3) that the people of Puerto Rico were not entitled to enforce or collect any of the taxes claimed to be due out of the real property or any part of it; and entered a decree accordingly. It is from this decree that this appeal is taken.

█ The intervener questions our jurisdiction to entertain the appeal on the ground that the proceeding in which the decree was entered was a proceeding in bankruptcy, and, being such, the appeal could only be allowed by this court under section 24b of the Bankruptcy Act, 11 USCA § 47 (b).

The treasurer, on the other hand, contends (1) that the matter in dispute raised by the motion or petition and denied by the opposition or answer presents a controversy in bankruptcy, appealable under section 24a, 11 USCA § 47 (a), and that the appeal was taken within thirty days after the decree was entered as required by section 24c, 11 USCA § 47 (c); and (2) that, if it was a proceeding in bankruptcy, it was an appeal from a judgment allowing or rejecting a claim of $500 or over, within the meaning of section 25a (3), 11 USCA § 48 (a) (3), and, having been taken within thirty days after the judgment appealed from was entered, it was seasonably taken; and that, whether the appeal was under section 24a or 25a, the appeal was as of right and properly taken in the District Court.

We think the contention of the Treasurer as to this matter must be sustained. The proceeding instituted in the District Court by the treasurer's motion or petition and the intervener's opposition or answer put in issue the amount of taxes due and owing by the bankrupt to the people of Puerto Rico and their right to a lien upon the real estate, then in the custody or possession of the receiver, prior and superior to the mortgage lien held and owned by the Squier Manufacturing Company. It was not a dispute in which the general creditors of the bankrupt were interested but a dispute in which these two particular creditors were interested; and the property, the subject-matter of the suit, was in the custody and possession of the receiver, the bond being substituted therefor. This being so, it does not seem to us that the matter involved a mere step in bankruptcy proceedings, and was therefore a proceeding in bankruptcy, but was a controversy arising in bankruptcy and appealable under section 24a, and that, in the event that it was a proceeding in bankruptcy, it was one within the provisions of section 25a (3), and the appeal was properly allowed in the District Court.

The appellant has assigned several errors, but the only one assigned and upon which it relies is No. 4, to the effect that the court erred in holding that the taxes in question "never did and do not constitute a statutory lien on the real property" prior and paramount to the mortgage lien. This assignment of error presents the question whether, under the statutes of Puerto Rico, the people of Puerto Rico had a lien on the real estate in question prior and superior to the mortgage of the intervener, the Squier Manufacturing Company, for any of the taxes above set out and which the District Court found were due and owing by the bankrupt to the people of Puerto Rico on July 3, 1931.

■ The first of these taxes so found to be due and owing were the taxes assessed upon the personal property of the bankrupt for the years 1928–29 and 1929–30, which, with the surcharges, amounted to $1,955.22.

There is no statute in Puerto Rico making taxes assessed upon personal property a lien upon the real estate of a taxpayer, to say nothing of making such a tax a lien prior and superior to a mortgage lien on such real property. It is practically admitted by the treasurer that there is no statute giving a lien for such taxes upon the real estate of a taxpayer, but, in doing this, he concedes little, for the Supreme Court of Puerto Rico has held that, while section 315 of the Political Code, as amended by the Act of the Legislative Assembly of the island on March 10, 1904, as to taxes assessed against real property provides that they "shall constitute the first lien thereon, and shall be prior to all other liens whatsoever on said property, whether the said liens attach before or after the lien of said taxes"; that "the same cannot be maintained with respect to the tax assessed against the personal property of the taxpayer"; that, "With regard to such tax on personal property, neither section 315 of the Political Code, nor any other section of said Code, gives it the character of a charge or lien on the real property of the taxpayer"; and that "The position of the Treasury of Porto Rico, with respect to the tax assessed against the personal property of the taxpayer, becomes the same as that of a personal creditor only, without any mortgage or lien whatsoever on the real property of the debtor." Estate of Romero v. Willoughby, 10 Porto Rico, 69, 75, 76.

■ The next taxes concern the premiums assessed for the Workmen's Relief Commission for the fiscal years 1928–29 to 1930–31, inclusive, including surcharges, amounting in all to $4,501.86. In section 38 of the Laws of Porto Rico (Act No. 85) approved May 14, 1928, it is provided:

"Section 38. The Treasurer of Porto Rico is hereby empowered, authorized and directed to levy, assess, and collect, semi-annually and in advance, from every employer of workmen subject to this Act, such annual premiums as may be determined in accordance with the preceding section, on the total amount of wages paid by said employer to workmen who were or would have been entitled to the benefits of this Act during the year prior to the levying of premiums, if the same had been in force; * * *

"The assessments shall be made as soon as the duplicate report referred to in Section 40 is received in the office of the Superintendent of Insurance, taking as a basis therefor the total amount paid for wages of workmen employed by each employer during the previous year who were or would have been entitled to the benefits of this Act if the same had been in force. Should an employer fail to pay the total amount legally assessed against him within the time fixed by the Treasurer, he shall be allowed thirty days' grace, and if on the expiration of this term he has still failed to pay, the Treasurer of Porto Rico, without excuse or delay, shall levy an attachment on any property of the employer and shall proceed to collect the assessment

due as in the case of collection of property taxes; Provided, That the Treasurer of Porto Rico may collect surcharges for every month or fraction thereof during which such assessments remain unpaid, at the rate of one per cent. a month; And Provided, further, That the Treasurer of Porto Rico is hereby empowered to utilize the services of the officers and employees of the Commission to aid him in collecting the assessments and in prosecuting such attachments as may be proper."

Section 40, after making it the duty of every employer of workmen entitled to the benefits of the act to file a duplicate statement under oath showing the number of workmen employed and the total amount of wages paid said workmen during the preceding fiscal year or evidence that such employer is insured in any of the forms authorized by the act, provides that the premiums or taxes on the total amount of wages prescribed in sections 37 and 38 of the act shall be computed, and, in the second paragraph, provides:

"Collection of these premiums shall have preference over any other obligation of the employer, and such premiums shall constitute a lien on the property of the employer, just as soon as the same shall be left unpaid upon service of notice to pay, with the same priority as granted insurance premiums due to insurers under the Civil Code."

By section 55 the amounts existing in the workmen's relief trust fund, created by section 1 of a similar Act approved April 13, 1916, were appropriated to the carrying out of the provisions of this act, and by section 57 all laws or parts of laws in conflict with the act were repealed.

The Act of 1916 (Laws 1916, No. 19) was in many respects similar to the Act of 1928. However, instead of levying the premiums or taxes semiannually, based on the total amount of wages, it levied them annually, and the last paragraph of section 14 provided:

"Should the employer fail to pay the premiums legally levied on him, the Treasurer of Porto Rico shall order the attachment of property of said employer, and shall proceed to sell the same at auction in accordance with the procedure established by the act to secure and collect due and unpaid taxes on property."

In this respect the provisions of the last-quoted clause of the Act of 1916 are substantially like those in the last-quoted clause of section 38 of the Act of 1928. But the Act of 1916 contained no such provision as is con-

tained in the last clause of section 40 of the Act of 1928, making the premiums or taxes a preference over every other obligation of the employer and constituting them a lien on the property of the employer with the same priority as is granted insurance premiums due the insurer under the Civil Code (see section 1824). ·

The paragraph above quoted in section 40 of the Act of 1928 constituting such premiums or taxes a lien and giving them the same priority as granted insurance premiums due the insurer under the Civil Code (section 1824), which the treasurer contends gives them priority over a mortgage lien, was not enacted until May 14, 1928, some two years after the mortgage lien here in question was given. This being the case, we are of the opinion that this provision of the act is not to be construed as giving a prior and superior lien over the intervener's mortgage upon the real estate, for to give it that effect would be to impair the obligations of the contract created by the mortgage given to the George L. Squier Manufacturing Company in 1926. Organic Act of Porto Rico, § 2, par. 5 (48 USCA § 737, par. 5). The people of Puerto Rico, therefore, had no lien prior and superior to the mortgage on the real estate for the collection of these premiums or taxes.

We do not regard the doctrine applied in the case of New York Terminal Co. v. Gaus, 204 N. Y. 512, 98 N. E. 11, as applicable. There it was held that the state of New York, by virtue of a statute giving it a lien for the payment of franchise taxes and by virtue of its sovereignty under the common law, had a lien prior and paramount to other incumbrances previously given on the property of the taxpayer. The Act of Puerto Rico of 1916, in force when the mortgage was given in 1926, did not give a lien upon real estate, as did the New York statute, and there is nothing here to show that, under the civil law, the people of Puerto Rico, by virtue of sovereignty, is given any prior and paramount right over that of other creditors, much less over a prior mortgage creditor. Indeed it is pointed out in Marshall v. New York, 254 U. S. 380, 41 S. Ct. 143, 65 L. Ed. 315, that under the common law of New York as inherited from Great Britain, the state, by virtue of its sovereignty, would not have priority as against a previously existing incumbrance in the absence of a statute giving a lien.

■ Now as to the excise taxes assessed against the the bankrupt for the manufacture of sugar for the years 1928–29 and 1929–30,

including surcharges, amounting to $6,518.-66: These excise taxes, according to section 42 of Act No. 85 of August 20, 1925, were to be paid by the manufacturer upon selling or otherwise disposing of the manufactured sugar and before removing the same from the factory, but, in the case of his failure to then pay the taxes, section 105 of that act provided:

"Section 105.—When any person bound by this Act to make payment of taxes levied hereunder, fails to do so within the time fixed therefor, the Treasurer of Porto Rico or his duly authorized agents are empowered to attach and sell property of the debtor at public vendue, pursuant to the procedure established in the Political Code to enforce payment of property taxes levied and unpaid, granting to the debtor the right of redemption on the same terms and to the same extent as provided by said Code."

This is the only provision relied upon or called to our attention in relation to the enforcement and collection of these taxes. It is apparent that it gives no lien on the property of the taxpayer or priority of payment over other creditors having liens on the property of the debtor; it only provides a method of forced collection by notice and sale of the property of the taxpayer; and it is not here contended that the District Judge erred in holding that the attachments or notices of sale were invalid.

The remaining taxes found by the District Court to be due and owing by the bankrupt to the people of Puerto Rico are the income taxes assessed on the income of the bankrupt for the year 1927, which, including surcharges, amounted to $4,326.25. Act No. 74 of August 6, 1925, imposing income taxes, in section 83 provides:

"Section 83.—The taxes imposed by this Act, and penalties, surcharges and interest, shall in all cases constitute a first lien in favor of The People of Porto Rico on the real and personal property and chattels real of the taxpayer, from and after the date of the publication of such taxes in the office of the collector of internal revenue of the respective municipality, and such taxes shall be collected by the Treasurer of Porto Rico in the same manner and through the same summary proceedings provided by existing law for the collection of property taxes."

Whether under this statute the people of Puerto Rico acquired a lien for the collection of these income taxes upon the real estate of the bankrupt prior to the mortgage thereon depends upon the meaning of the words "a first lien." The District Court in holding that the people of Puerto Rico had no lien on the real estate prior to the mortgage would seem not to have given effect to these words. It seems to us that the words "first lien" mean a lien prior to any other lien on the real property of the taxpayer for the purpose of securing the collection of taxes, and that the District Court erred in holding otherwise. It is not only a first lien upon the real estate, but upon the personal property of the taxpayer as well, and section 83 provides that the taxes may be collected in the same manner and through the same summary proceedings as is provided by existing law for the collection of property taxes. Under those provisions of law, if the personal property has been exhausted or there is no personal property, the levy may be made on the real estate. In this case the personal property has been exhausted and the real estate is subject to levy to pay the taxes. Political Code, §§ 334–336, 339–342, 347, 348, and 350.

Although there is no assignment of error as to the failure of the District Court to hold that the taxes amounting to $8,779.84 were legally due and owing, which, under the income tax statutes of Puerto Rico, the taxpayer was to withhold at the source, we are requested to review that question as being a plain error. We fail to see wherein we should entertain this question as a plain error. The District Court undoubtedly did not hold that these taxes were legally due and owing because of the decision of the Supreme Court of Puerto Rico of July 20, 1931, in the case of Gallardo v. Porto Rican Sugar Co., 42 Porto Rico, 646, which was affirmed by this court under the name of Domenech v. United Porto Rican Sugar Company, 62 F. (2d) 552. In that case it was held that the debt or credit, principal and interest, belonged to a corporation located and doing business in continental United States, and that the situs of the credit was at the domicile of the corporation in the United States, not in Puerto Rico, and that, as the debt or credit had its situs in the United States, it was not subject to taxation in Puerto Rico; that the Legislature of Puerto Rico had no authority to impose such a tax.

The judgment of the District Court is affirmed, except so far as it concerns the income taxes amounting to $4,326.25. As to those taxes it is reversed, and it is further ordered that the appellant have judgment for $4,326.25 and interest since July 3, 1931, with costs in this court.